JOHN W. SINGLETON, a/k/a JOHN WESTLY, a/k/a JOHN SINKLER Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Singleton v. Commissioner
Docket No. 9680-74.
United States Tax Court
T.C. Memo 1977-98; 1977 Tax Ct. Memo LEXIS 343; 36 T.C.M. (CCH) 440; T.C.M. (RIA) 770098; April 5, 1977, Filed *343 Laurence Goldfein,Ira L. Tilzer and Richard A. Levine, for the petitioner. Michael K. Phalin, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to Tax Year
Deficiency
[1]Section 6653(b) 1969
$20,554.10
$10,277.05
1970
11,506.63
5,753.32
1971
6,624.07
3,312.04
1972
56,999.56
28,499.78
The facts resulting in the initiation of the tax investigation of petitioner are set forth in detail in John W. Singleton,65 T.C. 1123 (1976). As a result of the concessions by respondent of errors in his computation under the expeditures method of proof, a partial abatement of amounts seized pursuant to a jeopardy assessment of August 9, 1974, has been made. The following issues are presented for decision: (1) Whether respondent may use an indirect method of proof to establish petitioner's income under the facts of this case; (2) Whether respondent must establish petitioner's net worth at the beginning and end of each taxable year in order to utilize the expenditures method of *344 proof; (3) Whether petitioner understated his taxable income for the years 1969 through 1972; and, if so, (4) Whether any part of the underpayment in income tax was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioner John W. Singleton (hereinafter petitioner) resided in Englewood, New Jersey, at the time he filed his petition in this proceeding. Petitioner timely filed Federal income tax returns for the taxable years 1969 through 1972 with the following Internal Revenue Service Centers: Year
Service Center
1969
Andover, Massachusetts
1970
Andover, Massachusetts
1971
Philadelphia, Pennsylvania
1972
Holtsville, New York
Petitioner was born in South Carolina and first attended school at the age of ten. He completed only four years of primary education and has limited reading ability. During the taxable years 1969 through 1972 and for many years prior thereto, petitioner was engaged in the bar and restaurant business in New York City. During the years in question, an office was maintained by petitioner at 1732 Amsterdam Avenue in New York City. Prior to 1969 petitioner *345 accumulated substantial assets. On June 25, 1963, petitioner purchased a home for $55,000 which was located at 488 North Woodland Street, Englewood, New Jersey, wherein he resided at the time he filed his petition in this case. He purchased a new 1968 Lincoln Continental Mark III on April 29, 1968, at a cost of $8,545. Petitioner owned real estate in New York City directly and through corporations and owned stock in National Investors Corp., Fund of America, and Freedom National Bank. He also maintained bank accounts at Chemical Bank, Freedom National Bank, Carver Federal Savings and Loan Association, First Federal Savings and Loan Association of Greenville, North Carolina, the Bank of Orangeburg, and Bowery Savings Bank. On October 9, 1962, petitioner acquired a safe deposit box at Chemical Bank in New York City. On January 31, 1969, he exchanged that safe deposit box for a larger one. On May 13, 1968, petitioner borrowed $5,000 from New Jersey Bank. The check issued by the bank was subsequently cashed by petitioner at Freedom National Bank. On May 23, 1968, petitioner borrowed $25,000 from Freedom National Bank which he used to pay an income tax deficiency of $25,790.25 *346 assessed against him by the Internal Revenue Service for the taxable year 1961. Prior to the payment of the deficiency, petitioner discussed with Morris Butcher, his accountant, whether his mutual funds should be sold to pay the deficiency. Mr. Butcher advised him to borrow the money from a bank instead of selling the mutual funds. In 1965 William Beck and Son of Englewood, New Jersey, began servicing the heating and air conditioning system in petitioner's home. On May 16, 1968, Irving Tschupp, an employee of William Beck and Son, went to petitioner's home to do a routine summer servicing of petitioner's air conditioning system. When he removed the panel covering the air conditioning system, a canvas bag, which was approximately 12 to 18 inches wide and 18 to 24 inches high and was of the type used by banks, fell out of the air conditioning unit onto petitioner's basement floor. When the bag hit the floor, six to ten bundles of currency fell out of it. The bundles were tied with strings or rubberbands. Mr. Tschupp only saw those bills on the top of each bundle. The denominations seen ranged from one dollar bills to one hundred dollar bills. Mr. Tschupp immediately placed the *347 money back into the bag. He could see other bundles of currency in the bag when he opened it to replace the bundles that had fallen out. After the money had been returned to the bag, it was approximately onefourth to three-eighths full. Mr. Tschupp then put the bag in the portion of the air conditioning unit from which it had fallen, replaced the panel and notified his employer, Robert Beck, of the discovery. Mr. Beck went to petitioner's home and waited for him to return and verify that the money was still intact. Petitioner returned about lunchtime. Later that day, petitioner and his friend Ernest Gadson traveled to the home of petitioner's brother-in-law, James (Pete) Hagens, in Greenville, North Carolina, taking with them a canvas bag filled with money which was placed in the trunk of the car. The next day, Friday, May 17, 1968, petitioner opened a savings account with $5,000 in cash at the First Federal Savings and Loan Association in Greenville, North Carolina, where Mr. Hagens was employed. On the same day he lent Mr. Hagens $1,000 in cash which was taken from the canvas bag in the trunk of petitioner's car and consisted of ten and twenty dollar bills tied in a bundle *348 with string. At the time the money was given to Mr. Hagens, he saw other bundles of currency neatly placed in the bag. Two days later, petitioner and Mr. Gadson drove to St. Matthews, South Carolina, taking with them the bag of currency. On May 20, 1968, petitioner acquired a safe deposit box at the Bank of Orangeburg in St. Matthews and opened a joint savings account at that bank with his mother, depositing in that account the sum of $3,000. The bag was not in the trunk when petitioner and Mr. Gadson left St. Matthews. On July 7, 1969, petitioner purchased land in St. Matthews, South Carolina, for $2,000. On the same day he visited his safe deposit box maintained in St. Matthews. On August 19, 1969, petitioner deposited $6,000 in cash with Smoak Construction Co. in St. Matthews for the construction of a house on the land he had purchased on July 7, 1969. The money was in neat packages of $1,000 and was taken from petitioner's briefcase. At 12:15 p.m. that same day, petitioner visited his safe deposit box. On January 6, 1970, petitioner paid $9,472 in cash to Smoak Construction Co. for the house and $900 in cash to Grubbs Furniture Co. in St. Matthews. The safe deposit box *349 maintained by petitioner in St. Matthews was visited by him at 10:00 a.m. that same day. Petitioner sold 374 shares of common stock of Freedom National Bank for $7,234.60 on October 29, 1968. The check issued in payment of the shares was endorsed by petitioner to Ralph Sharpe, a representative of Investors Planning Corp., to be invested in shares of Comstock Fund. Mr. Sharpe never invested the money for petitioner in those shares. In 1969 petitioner attempted to recover his money by having a letter sent to Investors Planning Corp. In 1970 Gerard Zwirn, petitioner's attorney, was able to obtain $1,000 in partial payment from Mr. Sharpe which he deposited in escrow. Pursuant to the agreement between Mr. Sharpe and Mr. Zwirn, Mr. Sharpe was to pay petitioner $1,000 each month until the full amount was returned. When the second payment was not received, Mr. Zwirn contacted Mr. Sharpe who told him that the additional amounts would be sent. After a period of time, Mr. Sharpe could no longer be contacted. The money placed in escrow was returned to petitioner in 1971 or 1972. On December 10, 1970, Mr. Zwirn instituted a suit against Ralph Sharpe, Investors Planning Corp., and its *350 successor, Equity Funding Corp., to recover petitioner's money. Mr. Sharpe could not be found and was never served. In June 1972, Mr. Zwirn filed a note of issue which is an announcement of readiness for trial. Equity Funding Corp. was declared bankrupt and Mr. Zwirn was enjoined in 1973 from continuing the lawsuit against it. With the exception of the $1,000 obtained from Mr. Sharpe in 1970, petitioner has recovered nothing further from Mr. Sharpe. On June 7, 1968, petitioner submitted a statement of finances to the State of New York Liquor Authority on which he listed cash assets of $5,188.88, all of which was on deposit in bank accounts. The financial statements did not make any reference to petitioner's home, the automobile purchased by him on April 29, 1968, his mutual funds, or his common stock in Freedom National Bank. A financial statement as of August 1, 1969, submitted to Freedom National Bank listed total assets of petitioner of $155,765. Of this amount, only $4,000 represented cash on hand and in banks. The statement was not signed by petitioner and did not reflect the ownership of his residence. During all or some portion of the period extending from 1969 through *351 1972, petitioner operated or performed services for the bars owned by the following corporations: Corporation
Name of Bar
Address of Bar
John Wesley, Inc.
Singleton's Bar
2268 8th Avenue
Freddie's 53, Inc.
Kings Lounge
338 Lenox Avenue
Freddie's Bar B-Q
Freddie's Lounge
2210 8th Avenue
Hoo Tai Restaurant, Inc.
Hoo Tai Bar
200 St. Nicholas Avenue
J. W. S. Restaurant Corp.
Sahara Bar
2419 8th Avenue Some of the bars were closed prior to the end of the period in question. Petitioner was the owner of record of John Wesley, Inc. The owner of record of Freddie's 53, Inc., and Freddie's Bar B-Q was petitioner's brother, Freddie Singleton, who was employed as a janitor for the bars. The owner of record of Hoo Tai Restaurant, Inc., was Jackie Clark, who married petitioner on June 16, 1971. The owner of record of J.W.S. Restaurant Corp. was Joseph Way. Mr. Way was employed as a cook in an establishment located on 112th Street in New York City during at least a portion of the years 1969 to 1972. In each of the five bars were placed a coin-operated pinball machine, pool table, juke box and cigarette machine, all of which were owned by petitioner. Petitioner treated these machines as a separate business *352 on Schedule C of his Federal income tax returns filed for the taxable years 1969 through 1972. Petitioner personally maintained all records of his vending machine business. There was a downtrend in the business of the five bars beginning in 1969 and continuing through 1972. All of the bars ceased operations either in 1972 or shortly thereafter. At the time of trial, the only corporation which was still engaged in business was Hoo Tai Restaurant, Inc. The other corporations had all ceased doing business. In early 1970 or 1971, Chester Harris was hired by petitioner on a part-time basis. He began as an assistant to his sister, Jackie Mae Clark, who acted as bookkeeper for the five bars. She soon taught him about the manner in which the bars operated and how to make out the payroll. He also participated in the supervision of the personnel employed by the bars. By at least June 1971, when his sister married petitioner, Mr. Harris became manager of the five bars. After her marriage to petitioner, Jackie Clark no longer performed bookkeeping services for the corporations; at that time Mr. Harris assumed full responsibility for such duties. As manager of the five bars, Mr. Harris *353 was responsible for collecting and counting the daily receipts from each bar, comparing the amount collected with the amount shown on the cash register tapes, recording the receipts in a "daybook" maintained for each bar, and making daily deposits for each bar into its separate checking account. He also checked to make sure that all of the employees were on duty and that each of the bars was clean and ready for business. At the beginning of Mr. Harris' employment as manager, he was given $3,500 by petitioner to be used for providing change for the bars. Mr. Harris needed approximately $1,500 to $1,700 per week for the change bags which he prepared and delivered to each of the bars. A portion of this amount he obtained from the change which remained in the cash registers of the bars. He generally needed $1,000 or more in change each week in addition to that remaining in the cash registers. Of this amount, $700 to $800 in quarters was usually required. Most of the time Mr. Harris was able to obtain $1,000 in change each week from petitioner to satisfy his change requirements. Almost all of the necessary quarters were obtained from petitioner. The coins which Mr. Harris "bought" *354 from petitioner were derived from his vending machine operation. The average amount of money collected from each machine each week was between $60 and $80. Mr. Harris collected the coins from the pool tables which petitioner maintained in the bars, keeping the coins from each machine separate. He did not count the money, but left it in the office safe. He gave these coins to petitioner at the end of each week. Petitioner collected the coins from the other vending machines. In addition to maintaining the daybooks, Mr. Harris also prepared the payroll from information contained in the daybook, recorded it in a separate payroll book, and paid the employees. The daybook from which information was taken contained the names of the employees on duty and the amount each employee in charge of a cash register was "short" based upon Mr. Harris' reconciliation of the cash register tapes and the receipts from the shift on which the particular employee worked. Any shortage reduced such employee's pay. When Mr. Harris first started his bookkeeping duties, the payroll was paid by check. However, sometime in 1971 after Mr. Harris assumed full responsibility of the bookkeeping for the various *355 bars, checks issued by the corporations began to bounce and petitioner decided to pay the employees in cash. The cash used to pay the employees was taken from Thursday's bar receipts collected by Mr. Harris each Friday morning. The amount of cash paid to each employee of each of the bars was entered by Mr. Harris in the daybook for the bar in which the employee worked. The amount paid to the employees of the respective bars was deducted from Thursday's receipts and the remainder was deposited in the bank account of each bar. Commencing with the time the payroll was first paid in cash until his employment was terminated in February 1972, Mr. Harris gave petitioner $500 every Saturday from Friday's bar receipts which had been collected that morning. This was done pursuant to petitioner's request. A portion of the $500 would be withdrawn from the receipts of each of the bars that could afford it. Petitioner instructed Mr. Harris as to what portion of the $500 was to be taken from each of the bars. Mr. Harris made notations in the daybooks as to what portion of the $500 had been taken from each of the bars. During the period while Mr. Harris was employed as manager of the five *356 bars, two of them did not have sufficient receipts to satisfy their expenses. During this period, petitioner gave Mr. Harris approximately $500 per week to deposit in the bank accounts of the two bars which were not meeting their expenses. He also gave Mr. Harris money to meet the payroll. Petitioner kept a personal record of the money given to Mr. Harris for deposit in the bank accounts of the two bars. At a later time, when the bars had adequate receipts, petitioner withdrew the money advanced in repayment from the bars. Mr. Harris was paid more than the amounts shown on his W-2 forms. This was done with the knowledge and pursuant to the instructions of petitioner. The accountant for petitioner and the various bars during the years 1969 through 1972 was Morris Butcher. He began performing services for petitioner about 1962. He was engaged to replace the prior accountant who kept poor records. Petitioner bemoaned the fact that he had substantial difficulty with his prior accountant. Mr. Butcher's duties with respect to the various corporations consisted of the preparation of payroll summaries, W-2 forms, payroll claim reports, payroll tax reports, sales tax reports, and checks *357 for the payment of beer and liquor expenses. Such checks were furnished presigned by the respective corporate owners of record to Mr. Butcher at petitioner's office. Mr. Butcher then filled in the appropriate amounts and names of payees. The books and records of the various corporations for which Mr. Butcher performed accounting services were maintained at petitioner's office and were available to Mr. Butcher whenever he needed them. His work required him to visit the office where the records were kept approximately once each week. He did not need to make special arrangements to review any books which were either prepared by him or prepared by the bookkeeper. If he had questions concerning the books, he spoke to the bookkeeper about them and not to petitioner. Jackie Mae Clark was the bookkeeper during some portion of the period 1969 through 1972. Chester Harris was in charge of bookkeeping from June 1971 until February 1972 and assisted his sister, Jackie Mae Clark, during the period when he was employed part-time. Mr. Butcher was also responsible for the preparation of a special ledger for John Wesley, Inc., in accordance with the requirements of the New York State Liquor *358 Authority. In the ledger he listed all receipts and all expenditures of funds relating to the operation of the business. The expenditures were determined by analyzing the check stubs from the checking account of John Wesley, Inc. Such analysis disclosed that there were checks drawn either to petitioner or to cash in addition to those drawn to specific business payees. Upon encountering check stubs reflecting the issuance of such checks, he would ask petitioner whether the checks were personal or business-related. Petitioner would then tell him whether or not to enter it as a business expense. If petitioner stated that the check was not business-related and not to reflect it in the ledger, Mr. Butcher made no further inquiry, believing that it represented merely an exchange for cash. Such an analysis and compilation was only made by Mr. Butcher with respect to the corporate checking account of John Wesley, Inc. In 1962, shortly after being engaged by petitioner as his accountant, Mr. Butcher prepared several Federal corporate income tax returns for a corporation named Singleton's Restaurant, Inc., a company which ceased doing business and was no longer in operation during the *359 years 1969 through 1972. When Mr. Butcher advised petitioner that he had prepared the corporate returns and requested additional compensation for the work, petitioner signed the returns but refused to pay for their preparation as he did not believe that he should have to pay for such preparation or file such returns if the business were not making money. Mr. Butcher then discussed the question of preparing similar returns for John Wesley, Inc., explaining that he believed the returns should be filed. After petitioner stated that he did not understand why he should pay for preparing returns if the bar were not making money, he shrugged and walked away. The matter was dropped and did not arise again. Mr. Butcher never again prepared a Federal corporate income tax return for any of the five corporations during the remainder of the period he acted as accountant for them and for petitioner. Mr. Butcher prepared the W-2 forms issued to petitioner by John Wesley, Inc., based upon information recorded in the payroll books of the corporation. The W-2 forms of petitioner from John Wesley, Inc., reflected the following amounts of compensation paid to petitioner: Year
Amount
1969
$7,900
1970
7,800
1971
7,800
1972
7,800
Mr. *360 Butcher did not consider those checks of John Wesley, Inc., drawn to petitioner or to cash which petitioner had told him were not business-related to be taxable income to petitioner. Because petitioner had told him that no money had been taken out of the corporation pursuant to such transactions, he merely considered them to be non-taxable exchanges of cash. John Wesley, Inc., was the only one of the five corporations with respect to which Mr. Butcher prepared a W-2 form for petitioner. Petitioner's income tax returns for the taxable years 1969, 1971 and 1972 reflect income from wages in the amounts shown on the W-2 forms issued to petitioner by John Wesley, Inc. The amount of wages reported on petitioner's income tax return for 1970 was the sum of the wages shown on the W-2 forms issued to petitioner by John Wesley, Inc., and Big J Car Service, Inc. None of the income tax returns for such years reflected any dividend income from John Wesley, Inc. The information relating to petitioner's personal vending machine business was obtained by Mr. Butcher directly from petitioner and not from the records maintained by petitioner. For the taxable years 1969 through 1972, petitioner *361 reported the following amounts of gross receipts from his vending machine operation: Year
Amount
1969
$25,248.10
1970
26,210.60
1971
29,233.35
1972
20,854.80
In 1969 petitioner reported gross receipts from a luncheonette business of $55,198.49 and a net profit of $1,561.45. The gross receipts from such business were obtained by Mr. Butcher from a ledger in which such receipts were recorded. Petitioner also reported income from interest, dividends, and capital gains on his Federal income tax returns filed for the years in question. The total increases or (decreases) in balances of bank accounts maintained by petitioner during the taxable years 1969 through 1972 were as follows: 1969
1970
1971
1972
Freedom Natl. Bank of New York
Account #XXX-3134
[1,372.80)
Freedom Natl. Bank of New York
Account #XXX-7644
(2,607.96)
Chemical Bank, New York
Account #XXX-XX0181
1,737.69
$ 937.97
[2,457.41)
$17,080.67
Chemical Bank, New York
Account #XXX-XX1681
3,208.16
153.72
161.72
871.58
Chemical Bank, New York
Account #XXX-XX0122
345.23
(652.05)
(737.90)
496.97 *
Carver Federal Savings & Loan
Account #X7955
15.12
832.85
51.75
3,013.28
Carver Federal Savings & Loan
Account #XX5277
20,000.00
Bowery Savings Bank
Account #X-XXX20-06
(52.91)
Bowery Savings Bank
Account #XXXX-X64-11
20,200.81
Citizens Natl. Bank
Account #357
20,191.64
American Bank & Trust (formerly
Bank of Orangeburg)
St. Matthews, South Carolina
Certificate of Deposit #5100
15,000.00
Bank of Orangeburg, St. Matthews
Account #XXX-XX169-7
5,406.35
(9,489.06)
** South Carolina Natl. Bank
Account #XX-XX-X5385
155.22
42.53
24.03
236.15
** South Carolina Natl. Bank
Account #XX-XX-X842-1
109.64
124.08
169.58
(6,297.21)
South Carolina Natl. Bank
Savings Certificate #37058
6,359.87
** First Federal Savings & Loan
Greenville, N.C.
Account #X1811
110.65
(5,376.28)
$ 1,700.95
$1,469.17
[2,788.23)
$87,611.79
*362 During the taxable years 1969 through 1972, petitioner expended at least the following amounts each week for living costs: Item
1969
1970
1971
1972
Food at home
$ 13.50
$ 14.35
$ 14.80
$ 15.35
Restaurant dinners
and snacks
.40
.45
.45
.75
House furnishings
1.30
1.30
1.50
1.60
Household supplies
.75
.90
.80
.90
Launderette service
2.15
2.55
2.70
2.85
Personal care
1.85
1.70
1.85
1.75
Medical care
4.30
4.70
5.00
5.15
Transportation to
work
4.00
6.00
6.00
7.00
Other transportation
19.10
20.55
21.45
21.65
Reading, recreation,
tobacco, etc.
5.20
5.95
6.05
6.25
Gifts, contributions
& miscellaneous
5.25
5.90
6.50
6.70
TOTAL WEEKLY COSTS
$ 57.80
$ 64.35
$ 67.10
$ 69.95
ANNUAL COSTS
$3,005.60
$3,346.20
$3,489.20
$3,637.40
The total amount of known expenditures made by petitioner during the taxable years 1969 through 1972 was as follows: 1969
1970
1971
1972
Repayment of loan to New Jersey
Bank
$ 1,934.76
$ 2,257.22
$ 483.69
$ -0-
Towne Motors
9,458.42
-0-
-0-
-0-
Suburban Underground Sprinkler
Systems, Inc.
126.00
104.00
44.10
19.00
William A. Beck & Son
154.45
495.75
370.95
384.59
Joseph Gramuglia
704.00
934.00
872.00
655.00
Gas & Electric
638.30
579.55
821.75
651.62
Telephone
134.87
555.56
572.99
965.23
Water Company
92.95
220.22
136.95
174.26
Towne T.V.
43.26
-0-
374.71
333.07
Parker Swimming Pool Co., Inc.
-0-
-0-
-0-
615.09
American Express
101.10
-0-
15.00
880.64
Master Charge
-0-
391.62
-0-
404.03
Playboy Clubs International
5.00
14.17
141.03
15.00
Real Estate Taxes--488 North
Woodland
2,389.80
2,793.79
3,032.77
3,180.70
Mortgage Payments--488 North
Woodland
1,745.00
1,755.00
1,750.00
1,608.75
Mortgage & Real Estate Taxes--
1725 Montgomery
2,223.00
3,071.00
3,096.00
3,096.00
Income Taxes & FICA.
10,086.56
4,099.62
3,181.60
3,480.40
Insurance Premiums--Pacemaker
Agency, Inc., or Warren H.
Goodwin, Inc.
1,100.00
72.00
192.00
610.00
Insurance Premiums--Metro. Life
Insurance Co.
451.95
451.95
451.95
451.95
Purchase of Land in
St. Matthews, S.C.
2,000.00
-0-
-0-
-0-
Construction of Home in
St. Matthews, S.C.
6,000.00
9,472.00
-0-
-0-
Purchase of Furniture for
Parents' Home
-0-
900.00
-0-
-0-
Repayments to Freedom National
Bank
6,000.00
1,404.25
13,097.50
-0-
National Investors Corp.
4,633.12
4,528.15
4,506.58
3,300.27
Fund of America
1,546.07
251.70
547.21
415.71
Equity Progress Fund, Inc.
-0-
-0-
-0-
17,535.15
Joseph Woods
-0-
-0-
-0-
5,200.00
Weekly Living Costs
3,005.60
3,346.20
3,489.20
3,637.40
Starets Clothes
375.69
297.04
729.85
-0-
Purchase of Encyclopedia
-0-
-0-
-0-
53.90
Gerard Zwirn
-0-
-0-
-0-
925.00
Safety Deposit Box Rentals
14.73
22.50
22.50
22.50
Charitable Contributions
75.00
150.00
150.00
150.00
Preparation of Tax Return
-0-
75.00
75.00
75.00
TOTALS
$55,039.63
$38,242.29
$38,155.33
$48,840.26
*363 The sums of the total increases (decreases) in the known amounts of money held by petitioner in banks and the total amount of known expenditures made by petitioner during each of the taxable years 1969 through 1972 are as follows: 1969
1970
1971
1972
Total increase or
(decrease) in
known amounts
held in banks
$ 1,700.95
$ 1,469.17
[2,788.23)
$ 87,611.79
Total amount
of known
expenditures
55,039.63
38,242.29
38,155.33
48,840.26
Total known funds
applied by
petitioner
$56,740.58
$39,711.46
$35,367.10
$136,452.05
During each of the taxable years 1969 through 1972, petitioner received dividend income in excess of $100. Petitioner also received capital gain dividends from mutual funds of which the following amounts constituted nontaxable source funds under section 1202: Year
Amount
1969
$1,156.30
1970
573.68
1971
315.00
1972
788.46
Petitioner liquidated his interest in National Investors Corp. on August 18, 1972, realizing $58,020.21. Petitioner's basis in the fund at the time of liquidation was $40,406.72, computed as follows: Payments during 1962
$ 3,750.00
Dividends reinvested - 1962
52.96
Payments during 1963
2,500.00
Dividends reinvested - 1963
183.84
Payments during 1964
2,500.00
Dividends reinvested - 1964
310.32
Payments during 1965
2,750.00
Dividends reinvested - 1965
477.07
Payments during 1966
2,750.00
Dividends reinvested - 1966
593.03
Payments during 1967
3,000.00
Dividends reinvested - 1967
1,383.61
Payments during 1968
2,750.00
Dividends reinvested - 1968
437.77
Payments during 1969
3,000.00
Dividends reinvested - 1969
1,633.12
Payments during 1970
2,750.00
Dividends reinvested - 1970
1,778.15
Payments during 1971
3,000.00
Dividends reinvested - 1971
1,506.58
Payments during 1972
1,500.00
Dividends reinvested - 1972
1,800.72
TOTAL BASIS
$40,406.72
*364 Petitioner realized a gain of $17,535.15 upon the liquidation of his interest in National Investors Corp., of which $8,806.75 constituted nontaxable source funds under section 1202. Petitioner received $17,535.15 upon the redemption of his shares in Fund of America on March 3, 1972. Petitioner's basis in the fund at the time the shares were redeemed was $14,898.89. Of the $2,636.26 gain realized by petitioner, $1,318.13 constituted nontaxable source funds under section 1202. During the taxable years 1969 through 1972, petitioner had the following amounts of nontaxable source funds available to him: 1969
1970
1971
1972
Accumulated Cash
$ 600.00 $ $ $
Dividend exclusion
100.00
100.00
100.00
100.00
Nontaxable capital
Gain dividend
under sec. 1202
1,156.30
573.68
315.00
788.46
Return of basis on
liquidation of
National Investors
Corp.
40,406.72
Nontaxable portion
of gain realized
on liquidation of
Natl. Investors
Corp. under sec.
1202
8,806.75
Return of basis on
liquidation of
Fund of America
14,898.89
Nontaxable portion
of gain realized
upon liquidation
of Fund of America
under sec. 1202
1,318.13
Refund from
Ralph Sharpe
1,000.00
Depreciation of
automobile
384.50
384.50
384.50
384.50
Depreciation on
return
1,131.00
731.00
731.00
731.00
TOTAL
$3,371.80
$1,789.18
$2,530.50
$67,434.45
*365 During the taxable years 1969 through 1972, petitioner was entitled to the following itemized deductions: 1969
1970
1971
1972
Interest paid to
New Jersey Bank
$ 342.45
$ 187.66
$ 8.15
$ -0-
Real Estate Tax
on 488 North
Woodland
2,389.80
2,793.79
3,032.77
3,180.70
Mortgage interest
on 488 North
Woodland
802.80
754.12
697.92
597.11
Mortgage interest
on 1725 Montgomery
1,252.34
1,645.78
1,616.64
1,585.41
Real Estate Tax
on 1725 Montgomery
489.51
690.24
719.94
753.06
New York State Tax
198.50
267.90
553.00
249.60
New York City Tax
42.45
52.80
54.60
54.60
Interest to Freedom
National Bank
-0-
404.25
97.50
-0-
Safe Deposit Box
Rentals
14.73
22.50
22.50
22.50
Charitable
Contributions
75.00
150.00
150.00
150.00
Preparation of
Tax Return
-0-
75.00
75.00
75.00
Gasoline Taxes
35.00
45.00
40.00
35.00
General Sales Tax
665.82
569.93
203.52
311.33
TOTAL
$6,308.40
$7,658.97
$7,271.54
$7,014.31
During the taxable years 1969 through 1972, petitioner understated his taxable income in the following amounts: 1969
1970
1971
1972
Funds Expended or
Applied
$56,740.58
$39,711.46
$35,367.10
$136,452.05
Less: Nontaxable source
funds available
3,371.80
1,789.18
2,530.50
67,434.45
Itemized
deductions
6,308.40
7,658.97
7,271.54
7,014.31
Personal
exemptions
600.00
625.00
675.00
750.00
Taxable income
reported
10,393.33
11,072.71
12,092.04
12,148.14
Unreported Taxable
Income
$36,067.05
$18,565.60
$12,798.02
$ 49,105.15
*366 During the period December 1, 1972 through April 1973, Special Agent Robert Mongelli was assigned by his supervisor in the Intelligence Division of the Internal Revenue Service to a detail at the Customs Service. This assignment required him to visit the Financial Unit of the U.S. Customs Service in New York City where he would examine Forms 4790, which were entitled "Report of International Transportation of Currency or Monetary Instruments." The purpose of the examination of these forms was to find leads for the initiation of tax investigations. Around the end of January 1973, Special Agent Mongelli discovered in the records of the Customs office a Form 4790 dated December 7, 1972, bearing the signature of petitioner. Upon discovering this form, Special Agent Mongelli began gathering information regarding petitioner. Special Agent Mongelli selected the Form 4790 signed by petitioner because of knowledge of two tax fraud investigations involving individuals who resided on the same street as petitioner and because of the amount of $20,000 which the form indicated petitioner took out of the United States.Prior to discovering this form, Special Agent Mongelli had no knowledge whatsoever *367 of petitioner, his activities, or his background. Nor was petitioner at the time of such discovery the subject of any investigation by the Internal Revenue Service. Upon completion of the information-gathering activity regarding petitioner, Special Agent Mongelli forwarded the report of his findings, along with the Form 4790, to the U.S. Treasury Target Selection Committee which then authorized the Intelligence Division of the Internal Revenue Service to initiate a criminal tax investigation of petitioner.His report stated that petitioner's name appeared on a list of suspected narcotics traffickers. After authorization of the criminal tax investigation of petitioner was received from the U.S. Treasury Target Selection Committee, the case was assigned to a team of agents headed by Special Agent Heriberito Collazzo on September 13, 1973. Also assigned to the investigation were Special Agents Garrett Howard and Anthony Mannherz and Revenue Agents John Spadola and Martin Kenneally. The initial stages of the investigation of petitioner included attempts to obtain his income tax returns from the Service Centers, numerous visits to the New York State Liquor Authority, and a visit to *368 New Jersey Bank to obtain loan information regarding petitioner. In addition, an undercover surveillance of petitioner was conducted at his home and place of business. A purpose for the surveillance was to ascertain expenditures made by petitioner. The initial stages of the investigation were conducted without notifying petitioner that he was under investigation. The first contact with petitioner was on the morning of December 11, 1973, three months after the case had been assigned for investigation. At approximately 7 a.m. on December 11, 1973, without prior notification and without arranging with petitioner in advance for an appointment, Special Agents Howard and Mannherz arrived in front of petitioner's home in Englewood, New Jersey, for the purpose of interviewing him as part of their criminal investigation. The motive for the early arrival of the agents was two-fold: (1) previous surveillance having revealed the time range during which petitioner normally left for work, they knew that they had to arrive early in order to interview him at his home which would be free of the distractions normally inherent in an interview at one's place of business, and (2) they desired to *369 conduct the interview at a time when they knew petitioner would be unprepared. At 8:05 a.m., approximately 20 minutes after first observing signs that petitioner had awakened, Special Agents Howard and Mannherz rang his front doorbell. After petitioner opened the front door, the two special agents identified themselves as Special Agents of the Intelligence Division of the Internal Revenue Service and stated that they wished to discuss petitioner's financial affairs and have him identify some of his tax returns. Special Agent Howard told petitioner that he was the subject of a criminal tax investigation. He then read petitioner his Constitutional rights under the Fifth and Sixth Amendments. The interview lasted approximately two hours. Petitioner was cooperative during the interview and answered all questions posed by the special agents. At the same time petitioner was being interviewed, Morris Butcher, his accountant, was being interviewed concerning petitioner's affairs. That interview was also conducted without prior appointment or notification. During the interview on December 11, 1973, respondent's agents requested petitioner to furnish various documents to them. Petitioner *370 advised the agents that the documents requested were at his office located at 1732 Amsterdam Avenue, New York, New York, and he arranged with the special agents to meet them the following morning. The next morning, December 12, 1973, Special Agents Howard and Mannherz met with petitioner at his office, bringing with them a Recordak machine which is capable of microfilming documents. Special Agent Mannherz microfilmed the documents furnished by petitioner. This microfilming took one to two hours, as there were many documents which had to be copied. Petitioner made no objection during this time to the microfilming of the documents, nor did he offer any impediment to the agents. While Special Agent Mannherz was microfilming the documents, Special Agent Howard requested and received petitioner's permission to look around the office. He requested permission to remove the numerous books, records, accounting workpapers and other documents from the file cabinet and take those documents back to the office of the Internal Revenue Service. Petitioner consented to the removal of all of the documents which Special Agent Howard requested. He also furnished one or two cartons to enable the *371 documents to be transported and he carried the documents out to the automobile of the special agents for them. Included among the documents which were microfilmed by the special agents on December 12, 1973, were receipts showing the following: (1) the sale by petitioner of his shares in National Investors Corp., a mutual fund, on June 18, 1972, for $58,020.21; (2) the transfer of his shares in Fund of America, a mutual fund, on March 3, 1972, for $17,535.15; and (3) the acquisition of shares in Equity Progress Fund for $17,535.15, on March 27, 1972. Other documents microfilmed included petitioner's checks drawn on his bank account at Chemical Bank for deposit to savings accounts in the Bowery Savings Bank and Carver Savings and Loan Association. Special Agent Howard never reviewed the microfilm. The special agents did not give petitioner a detailed receipt for the books and records which they took from the office on December 12, 1973. They provided a receipt which described in very general terms the books and records they took. The receipt made reference to personal papers.During the meeting petitioner also executed Form 872 extending the period of limitation on assessment for *372 the taxable year 1970 to December 31, 1976. In addition to making inquiries of petitioner at the interview of December 11, 1973, the agents made numerous other attempts to ascertain the existence of nontaxable sources of income received by petitioner during the years 1969 through 1972. Letters were sent to major brokerage houses in the New York City area requesting information relating to transactions by petitioner with respect to stock. Transcripts of the account of petitioner with three mutual funds were obtained. Information was requested from the U.S. Treasury Department concerning bonds that petitioner might have bought and sold at any time. A canvass was made of banks in the area of petitioner's home and business, in South Carolina, and in Perry, Georgia, to ascertain the existence of loans obtained by petitioner. In addition, letters were sent to loan companies in the New York City area. Several major insurance companies were contacted to determine whether petitioner had received any insurance recoveries. The Surrogate's Courts in Englewood, the Bronx, and Manhattan were visited to determine whether petitioner had received any inheritances during the years in question. *373 In attempting to ascertain whether nontaxable funds had been received on the condemnation of property, the New York Housing Authority and the Corporate Council for the City of New York were contacted. This revealed that one of petitioner's houses had been condemned and the City had paid off the mortgage and paid petitioner $500. The Departments of Motor Vehicles of New Jersey and New York were contacted to see if petitioner had sold any automobiles. Finally, companies having major credit cards and various retail stores in the area of petitioner's residence were contacted. During the investigation, respondent's agents never issued a summons to petitioner for any personal books and records. Nor did they issue a summons for records of any corporation or business entities with which they believed petitioner was associated. A jeopardy assessment was made against petitioner on August 9, 1974, and payments of income tax and additions to tax, arising from notices of levy and seizures of property, were made during the month of August 1974. A statutory notice of deficiency, setting forth income tax deficiencies and additions to tax for fraud totaling $143,526.55 for the taxable years 1969 *374 and 1972, was mailed to petitioner on September 20, 1974.The notice of deficiency was based on the same computation of omitted income as was the jeopardy assessment. ULTIMATE FINDINGS OF FACT 1. Petitioner understated his taxable income for the years 1969, 1970, 1971, and 1972 in the amounts of $36,067.05, $18,565.60, $12,798.02, and $ 49,105.15, respectively. 2. At least a part of the underpayment of income tax in each of the taxable years 1969, 1970, 1971, and 1972 was due to fraud on the part of petitioner. OPINION The ultimate questions for decision in this case are whether petitioner understated his taxable income for the years 1969 through 1972, and, if so, whether any part of the resulting underpayments of income tax was due to fraud. Before proceeding to these issues, we must determine whether respondent is precluded from using an indirect method of proof under the facts of this case and whether the government must first compute a taxpayer's beginning and ending net worth for each taxable year before utilizing an expenditures method of proof. In taxable years not barred by the running of the period of limitation on assessment, the burden of proof with respect to deficiencies *375 in income tax is generally on the petitioner, while the burden of proving fraud in each year is on the respondent. Fraud must be affirmatively established by clear and convincing evidence. Stratton v. Commissioner,54 T.C. 255 (1970); Pigman v. Commissioner,31 T.C. 356 (1958); Cohen v. Commissioner,27 T.C. 221 (1956); Rule 142, Tax Court Rules of Practice and Procedure. Where taxable years are barred by the statute of limitations in absence of a finding of fraud, respondent must affirmatively show that the tax was underpaid in each of those years and that part of the underpayment of tax in each year was due to fraud. This is not to say that respondent must prove the precise amount of the underpayments, for that is not part of the burden of proving fraud. However, respondent must at least prove that some part of the underpayment of tax for each year in question was due to fraud with intent to evade taxes. Shaw v. Commissioner,27 T.C. 561, 570 (1956), affd. 252 F.2d 681 (6th Cir. 1958); Willits v. Commissioner,36 B.T.A. 294 (1937). Assessment of additional tax for the taxable year 1969 is barred except for fraud. The burden of proof with respect to the deficiencies is on *376 petitioner for the taxable years 1970, [2] 1971 and 1972, the taxable years before us for which the statute of limitations has not expired. Welch v. Helvering,290 U.S. 111 (1933). We put the burden of going forward on respondent at the trial.As a result of our ruling, petitioner maintains that respondent has the burden of proving a deficiency in petitioner's income tax for each of the years in question. Petitioner's position is not only contrary to the specific terms of our ruling, but also the established case law. United States v. Rexach,482 F.2d 10, 16 (1st Cir. 1973), cert. denied 414 U.S. 1039 (1973); Psaty v. United States,442 F.2d 1154 (3d Cir. 1971); United Aniline Company v. Commissioner,316 F.2d 701 (1st Cir. 1963). However, even had our ruling shifted the burden of proof with respect to deficiencies in income tax for the taxable years 1970, 1971 and 1972 to respondent, the evidence presented by him is clearly adequate to sustain such a burden. Indirect Method of Proof
Petitioner's first *377 argument is that in light of the facts surrounding the investigation respondent is precluded from using an indirect method of proof in determining petitioner's income. Those facts relied upon by petitioner relating to the initiation of the tax investigation have no bearing on the issues before us. This Court has repeatedly held that it will generally not look behind the notice of deficiency to examine the evidence used or the propriety of respondent's motives or his administrative policy or procedure in making his determinations. Estate of Smith v. Commissioner,57 T.C. 650 (1972); Figueiredo v. Commissioner,54 T.C. 1508, 1513 (1970). Flynn v. Commissioner,40 T.C. 770, 772 (1963). The underlying rationale for this rule is that a trial before the Tax Court is a proceeding denovo ; our determination as to petitioner's tax liability must be based on the merits of the case and not upon events preceding the trial of the case. Greenberg's Express v. Commissioner,62 T.C. 324 (1974). We are at a loss to understand how the failure to utilize some of the documents microfilmed at petitioner's office on December 12, 1973, or to issue summons for other books and records can preclude respondent *378 from using an indirect method of proof. Petitioner even made the following statement on page 81 of his opening brief: "[Having] decided to build a case against petitioner using the expenditures method of proof even before their interview with petitioner, there was no need to review and analyze the records. * * * [They] probably regarded the records as surplusage." Petitioner's reliance on such facts is especially surprising in light of the well-settled rule that the Government need not first determine the adequacy of a taxpayer's books and records prior to resorting to an indirect method of proof. Holland v. United States,348 U.S. 121, 130 (1954). Petitioner next points to substantial errors in the statutory notice of deficiency in urging that respondent may not use an indirect method of proof. However, we are satisfied that those errors which respondent has conceded were not the result of bad faith on the part of the Government's agents. The other facts relied on by petitioner relate to whether the special agents attempted to trace "leads" dealing with nontaxable sources of funds. In Holland v. United States,supra at 135-136, the Supreme Court set forth the following rule which *379 has become known as the "leads doctrine" as an aid to lower courts passing on the sufficiency of evidence to convict: When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer--leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury. This should aid in forestalling unjust prosecutions, and have the practical advantage of eliminating the dilemma, especially serious in this type of case, of the accused's being forced by the risk of an adverse verdict to come forward to substantiate leads which he had previously furnished the Government. It is a procedure entirely consistent with the position long espoused by the Government, that its duty is not to convict but *380 to see that justice is done. [Emphasis added.] The Court further stated that "where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant * * *." Thus, a taxpayer cannot complain about the sufficiency of the Government's investigation where he has offered no leads at all. In United States v. Mackey,345 F.2d 499 (7th Cir. 1965), the taxpayer maintained that it constituted prejudicial error for the Government not to have offered evidence relating to whether its agents had checked to determine whether he had received any loans, inheritances, or gifts during the indictment years. Citing Holland,supra, the Seventh Circuit held that the Government was only required to investigate and negate "reasonable explanations by the taxpayer inconsistent with guilt" and that the taxpayer had the right to remain silent but did so "at his peril." Mackey, at 506. In the instant case the petitioner supplied no leads whatsoever in regard to cash allegedly accumulated as of January 1, 1969. At the interview of December 11, 1973, he stated that the maximum amount of cash he kept *381 on hand during the years 1968 through 1972 was $600 which was used for business purposes and stated that there was no cash in the safe deposit box maintained at Chemical Bank. Thus, there were no "leads" regarding accumulated cash supplied by petitioner which the government was required to investigate. Petitioner also points to the fact that respondent's agents did not contact Mr. Tschupp for information regarding his finding of a bag of cash in petitioner's home as revealed by Mr. Beck in a conversation sometime in early 1974. That Mr. Tschupp was not contacted is clearly understandable in light of the fact that Mr. Beck did not know when the money was found and indicated that Mr. Tschupp was in the hospital after having suffered several heart attacks and was not expected to live. Nor does the fact that they did not interview Mr. Barenhill, who apparently saw a large amount of cash in petitioner's safety deposit box sometime in 1973 or 1974, indicate that they did not attempt to ascertain the existence of nontaxable sources, for this cash was seen after the years in question. Petitioner also alleges that the special agents failed to adequately investigate the "lead" furnished *382 by petitioner that he purchased mutual funds from an agent named Ralph Sharpe. Assuming arguendo that such information constitutes a "reasonable explanation by the taxpayer inconsistent with guilt" requiring investigation under Holland, we find petitioner's interpretation of the facts contrary to the record before us. Special Agent Howard testified that letters requesting information relating to transactions by petitioner with respect to stocks were sent to major brokerage houses in the New York City area. The investigation indicated that petitioner owned shares in three mutual funds. These companies were contacted and transcripts of account were obtained. Agent Howard asked an employee of one of the mutual funds in California to obtain information concerning Ralph Sharpe. Due to the fact that the transcripts of account were obtained from the mutual funds, Special Agent Howard did not make further attempts to contact Mr. Sharpe, believing that he had made sufficient efforts to obtain the necessary information. Considering the vagueness of this "lead" and the efforts made and information obtained relating to security transactions, we conclude that the agent's investigation of *383 this potential source of nontaxable funds was adequate. Petitioner also seems to question the overall thoroughness of the efforts made by respondent's agents to ascertain the existence of nontaxable sources of funds. In making this vague contention which is closely related to the question of the investigation of "leads," he relies upon the following statement in United States v. Morse,491 F.2d 149, 154 (1st Cir. 1974): * * * the agent does have an overall burden to prove that he has done the best he can to discover, and exclude, all non-income items from the reconstructed income. * * * In that case the appellate court reversed a conviction for tax evasion on the basis of the Government's failure to corroborate with independent evidence the agent's testimony regarding the elimination of non-income items from a bank deposits computation. Thus, the rule articulated in that case would have no application to the facts of this case. As we mentioned earlier, a taxpayer cannot complain about the sufficiency of an investigation where he has offered no leads or only vague or remote leads. United States v. Mackey,345 F.2d 499 (7th Cir. 1965); Talik v. United States,340 F.2d 138 (9th Cir. 1965). *384 However, even if we were to apply the rule quoted above to the investigation of this case, the following efforts of the agents to ascertain the existence of nontaxable sources of funds would clearly result in its satisfaction. In addition to contacting major brokerage houses in the New York City area and various mutual funds as mentioned earlier, they conducted a canvass of banks in the area of petitioner's residence and business, in South Carolina, and in Perry, Georgia, the residence of petitioner's former wife, to ascertain the existence of loans made to petitioner during the taxable period. Letters were also sent to loan companies in the New York City area. The Surrogate's Courts in Englewood, the Bronx, and Manhattan were visited to determine whether petitioner had received any inheritances during the years in question. The agents also contacted several major insurance companies to determine whether petitioner had received any insurance recoveries. In attempting to ascertain whether nontaxable funds had been received on the condemnation of property, the New York Housing Authority and the Corporate Council for the City of New York were contacted. This revealed that one of *385 petitioner's houses had been condemned and that the city had paid off the mortgage and paid petitioner $500. They requested information from the U.S. Treasury Department concerning bonds that petitioner may have bought and sold at any time. In addition, the Departments of Motor Vehicles of New Jersey and New York were contacted to see if petitioner had sold any automobiles. Finally, companies having major credit cards, such as American Express and Master Charge, and various retail stores in the area of petitioner's residence were contacted. In view of the above facts relating to what appears to be a diligent and commendable effort on the part of respondent's agents to ascertain the existence of nontaxable sources of funds, it is difficult to understand how it can be argued that an adequate investigation was not conducted. We consider the Fifth Circuit's reply to the taxpayer's contention in United States v. Penosi,452 F.2d 217 (5th Cir. 1971), that the investigation was not thorough enough to rule out all non-taxable sources of income to be particularly applicable to the question of whether respondent's agents conducted an adequate investigation in this case: Once expenditures *386 are established, the government cannot be expected to conduct an exhaustive nationwide investigation when the defendant supplies no relevant leads as to where he got the money he * * * spent. [452 F.2d at 220.] Accordingly, we conclude on the basis of existing case law and the facts before us that respondent is not precluded from utilizing an indirect method of proof. Requirement of Opening Net Worth
Petitioner's next argument is that respondent's computation is legally insufficient because it omits petitioner's net worth at the beginning and ending of each taxable year. In support of his argument he relies primarily upon quotations taken from the Third Circuit's opinions in Hoffman v. Commissioner,298 F.2d 784 (3d Cir. 1962), and United States v. Caserta,199 F.2d 905 (3d Cir. 1952). The quotation from Caserta, found on page 906-907 of the opinion, is as follows: An outgrowth of this net worth method is the "expenditure" test involved in this case. The theory of it is simple, though its application may become difficult. It starts with an appraisal of the taxpayer's net worth situation at the beginning of a period. He may have much or he may have nothing. If, during that period, *387 his expenditures have exceeded the amount he has returned as income and his net worth at the end of the period is the same as it was at the beginning (or any difference accounted for), then it may be concluded that his income tax return shows less income than he has in fact received. Of course, it is necessary so far as possible, to negative nontaxable receipts by the taxpayer during the period in question * * *. The passage from Hoffman relied upon by petitioner reads as follows: It is now well established that when the Commissioner resorts to the "cash expenditure method" of reconstructing income, it is necessary that he meet the requirements for its use established by the Supreme Court and the Courts of Appeals * * *. The Supreme Court, in the Holland case, laid down the requirements for the use of the "cash expenditure method" of reconstructing income when it said at p. 132 * * *: * * * an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness *388 of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. [298 F.2d at 786-787.] Although the language quoted from the two opinions of the Third Circuit, the court of appeals to which an appeal from our decision herein will lie, appears to support petitioner's position, neither case dealt directly with the question of whether the Government must in all instances establish a taxpayer's begining and ending net worth before utilizing the expenditures method of proof. In Taglianetti v. United States,398 F.2d 558 (1st Cir. 1968), the First Circuit was confronted with the question of what evidence would satisfy the requirement of Holland v. United States,348 U.S. 121 (1954), quoted by petitioner from Hoffman,supra. The question of what evidence was necessary to satisfy the requirement of beginning and ending net worth figures was resolved as follows: This state of the proof fully satisfies the requirement in Holland v. United States, 348 U.S. 121, 132, 75 S. Ct. 127, 134, 99 L. Ed. 150 (1954), of "the establishment, with reasonable certainty of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's *389 assets." In a typical net worth case, as Holland, precise figures would have to be attached to opening and closing net worth positions for each of the taxable years to provide a basis for the critical subtraction. In a cash expenditures case, reasonable certainty may be established without such a presentation, as long as the proof--as in this case--makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures.We recognize that courts occasionally blur the distinction between the two approaches and use language implying that they are subject not only to the same principle of excluding the availability of nontaxable resources but also to the same method of implementing that principle, i.e., establishing net worth figures. Appellant has cited several cash expenditure cases for the latter proposition. A careful review of the language used and the problems addressed in these opinions indicates that they cannot be fairly read as embracing such an inflexible formal requirement. [398 F.2d at 564-565.] [Emphasis added.] [Footnote omitted.] In footnote 7, the Court made the following statement with respect to *390 the language in Caserta,supra, quoted by petitioner: In United States v. Caserta, supra, n. 4, the court refers to "an appraisal of the taxpayer's net worth situation at the beginning of a period" and the need to account for any subsequent changes.Here, too, we see no intimation that these objectives can be accomplished only through formal net worth statements. * * * [398 F.2d at 565.] The underscored portion of the above passage from Taglianetti was quoted with approval in United States v. Bianco, F.2d (2d Cir. 1976, 37 AFTR 2d 76-1274, 76-1 USTC par. 9351), and United States v. Fisher,518 F.2d 836, 841 (2d Cir. 1975), cert denied 423 U.S. 1033 (1975). We must now determine whether "the proof * * * makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures." Taglianetti,supra at 565. Other than the mutual funds, the adjustments for which respondent has conceded, the only other asset which petitioner seriously contends was utilized in making the expenditures with which he was charged was a substantial cash hoard existing on December 31, 1968. In the instant case, we have found as a fact that petitioner *391 took a bag of currency to South Carolina in May 1968. During the course of the trip, he made two deposits to savings accounts totaling $8,000, lent his brother-in-law $1,000 and apparently placed the remaining cash in a safe deposit box acquired on May 20, 1968.The deposit box was not entered again until March 1969 and was entered a total of 9 times during the years 1969 through 1972.Despite the existence of these facts establishing that petitioner possessed a substantial amount of cash as of the beginning of the years in question, there is not one scintilla of evidence relating to the amount of cash placed in the safety deposit box on May 20, 1968, or how much of this cash, if any, was used in making the expenditures with which petitioner has been charged. Although both of these facts are peculiarly within the knowledge of petitioner, he failed to testify or submit documentary evidence relating to either. Petitioner contends that the bag contained at least $80,000 when it was seen by Mr. Hagens and Mr. Gadson. This result and the underlying reasoning, the logic of which escapes us, is set forth as follows on page 110 of his reply brief: Tschupp testified that eight or ten bundles *392 fell out of the bag when it fell to the floor, and that these bundles scattered all over the floor. From the testimony of Mr. Hagens and Mrs. Smoak, it appears that each bundle contained $1,000. That eight or ten bundles fell out of the bag indicates that there was at least $8,000 to $10,000 in cash on the floor. Tschupp said that more money remained in the bag. That as many as ten bundles were strewn all over the floor suggests that at least five or six times that number remained in the bag. However, even if only an equal amount remained in the bag, i.e., an additional $1,000 [sic], if Tschupp's estimate that [the] bag was only one-quarter full when he saw it is correct, the bag, which had at least $20,000 when Tschupp saw it, had at least $80,000 when Hagens and Gadson saw it full of money. Gadson testified that the money bag appeared no different between the first time he saw it in New York at the start of the trip and the last time he saw it in St. Matthews. Accordingly, removal of a few bundles for the deposit in Greenville and the loan to Hagens, made no noticeable difference in the appearance of the bag. In the first place, the fact that the cash given to Mrs. Smoak on *393 August 19, 1969, and January 6, 1970, was in neat bundles of $1,000 does not tend to establish that each bundle placed in the bag consisted of $1,000. The conclusion urged by petitioner first assumes that such cash was part of the cash placed in the safe deposit box on May 20, 1968. Although petitioner visited his safe deposit box on August 19, 1969, and January 6, 1970, this does not tend to establish that the money was taken from the box or was part of the currency placed in the box on May 20, 1968. The record reveals that the safe deposit box was visited by petitioner on March 12, 1969, July 7, 1969, and July 30, 1969. The money received by Mrs. Smoak could also have come from currency which might have been placed in the box on such dates. Nor does Mr. Hagens' testimony tend to establish that each bundle contained $1,000, for he only had knowledge of the amount of cash in one of the bundles. Furthermore, it is impossible to ascertain, as petitioner attempts to do, the number of bundles in the bag. Mr. Tschupp testified that six to ten bundles fell out of the bag, not eight to ten as stated by petitioner, and that the bag was approximately one-fourth to three-eights full when *394 the money was returned. To venture a guess as to the amount of cash in the bag based on the vague facts before us would be to engage in pure speculation. In our opinion, the $9,000 which was admittedly not placed in the safe deposit box would seem to account for most of the cash in the bag at the time it was discovered by Mr. Tschupp and at least a significant portion of the currency seen by Mr. Hagens and Mr. Gadson.This conclusion is supported by the fact that petitioner incurred interest-bearing indebtedness totaling $30,000 in May 1968. It seems very unlikely that petitioner, a businessman with several savings accounts and investments, would forego the earning of interest on $80,000 or even a substntially lesser amount, while at the same time borrowing such a large amount on which he would have to pay interest. Cefalu v. Commissioner,276 F.2d 122, 127 (5th Cir. 1960); Boyett v. Commissioner,204 F.2d 205 (5th Cir. 1953). This would be especially true in the case of a taxpayer such as petitioner who reported only about $12,000 per year in taxable income. Thus, although we are unable to ascertain on the basis of facts before us the amount of cash on hand as of December 31, 1968, *395 a fact peculiarly within the knowledge of petitioner, we do consider the amount suggested by him to be greatly excessive. We must now attempt to determine to what extent, if any, the accumulated cash was used in making the expenditures with which petitioner has been charged. Respondent offered evidence relating to the substantial efforts made by his agents to discover sources of nontaxable income which we discussed in the previous section of this opinion. Respondent then attempted to establish the amount of expenditures made by petitioner during the years in question. We consider that this evidence established primafacie the correctness of the amount of cash on hand utilized in the statutory notice and negated the use of nontaxable sources in making the expenditures. See United States v. Penosi,452 F.2d 217, 219 (5th Cir. 1971). Petitioner then came forward with evidence establishing the existence of an indeterminate amount of cash maintained in a safe deposit box in St. Matthews, South Carolina, at the beginning of the taxable period, thus proving that the amount of cash on hand as of December 31, 1968, used by respondent in the statutory notice was erroneous. However, he failed *396 to present any evidence tending to show the utilization of these funds in making the expenditures. On page 34 of his reply brief, petitioner contends that he has specifically traced the sums of $8,000, $10,372 and $20,000 expended in the taxable years 1969, 1970 and 1972, respectively, to his cash hoard. He then states that "the additional amount of his cash hoard is available as a credit against any alleged omitted income which may result from the expenditures computation." This "heads I win--tails you lose" approach of petitioner simply cannot prevail.In essence, he alleges that no understatements in reported income can result simply because he has shown that he possessed cash in a safe deposit box at the beginning of the years in question. First, neither has petitioner shown nor do we believe that the cash placed in the safe deposit box on May 20, 1968, exceeded the sum of the amounts listed above.Thus, we do not believe that "the additional amount" to be applied "as a credit against any alleged omitted income" even existed. Moreover, petitioner's contention that he is entitled to credit for those amounts "specifically traced as expended from his cash hoard" is equally without *397 merit. This specific tracing allegedly shown by petitioner is merely based on the fact that he made payments of $6,000 and $9,472 in St. Matthews, South Carolina, on August 6, 1969, and January 6, 1970, respectively, that the payments were made with bundles of cash consisting of $1,000 each and that he visited his safe deposit box in St. Matthews on such dates. The alleged tracing of the additional $2,000 in 1969 is based on the fact that he purchased land in St. Matthews for $2,000 on July 7, 1969, and that he visited his safe deposit box on the same date.Based upon our review of the record, we can only find one instance in 1972 when petitioner entered into a transaction which resulted in his being charged with additional income that occurred on the same date he visited his safe deposit box. This occurred on July 10, 1972, when account No. XXX-XX169-7 at American Bank and Trust in St. Matthews, South Carolina, was closed and a two-year certificate of deposit in the amount of $15,000 was acquired from the same bank. The account had a balance of $9,489.06 on the day it was closed. The remaining amount of approximately $14,500 allegedly "traced" by petitioner was apparently added *398 to eliminate any unreported income in his proposed computation. When viewed in the light of the entire record, we do not consider the fact that an expenditure was made in St. Matthews on the same date as petitioner entered his safe deposit box to constitute evidence from which we can infer that the funds utilized came from accumulated cash. As we pointed out earlier, petitioner visited his safe deposit box once in 1969 before making the July 7, 1969 expenditure of $2,000. The box was also entered once between the July 7 and August 19, 1969 visits. Thus, assuming that the funds expended on July 7, 1969, August 19, 1969, and January 6, 1970, were taken from the safe deposit box on such dates, it is possible that they consisted of cash placed in the box in 1969. Furthermore, on each of these dates, petitioner might have brought cash from New York to make the expenditure and deposited the remainder in the safe deposit box. When the strong evidence relating to what we consider "probable" sources of unreported income is considered, both of the above possibilities are just as likely as the inference petitioner wishes us to draw. We will not attempt to speculate with respect to, much *399 less list, the infinite combinations of exchanges which might have occurred at the safe deposit box during the years in question. In the instant case we have not been given the opportunity to observe petitioner's demeanor while on the witness stand or to hear his testimony relating to the amount of accumulated cash, if any, which was used in making the expenditures for which he has been charged. See United States v. Bethea, F.2d (4th Cir. 1976, 37 AFTR 2d 76-1329, 76-1 USTC par. 9379). The record is devoid of evidence showing the disposition of the cash in the safe deposit box. Petitioner himself was the only person who could throw any light on this matter. Yet he deliberately chose not to take the witness stand and subject himself to cross-examination. Petitioner's failure to introduce evidence solely within his possession, which, if true, would be favorable to him, gives rise to a presumption that if produced it would be unfavorable and becomes, itself, "evidence of the most convincing character." Interstate Circuit v. United States,306 U.S. 208, 226 (1939); Stoumen v. Commissioner,208 F.2d 903, 907 (3d Cir. 1953); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), *400 affd. 162 F.2d 513 (10th Cir. 1947). Without the benefit of petitioner's testimony or some documentary evidence, he simply cannot be credited with expenditures from accumulated cash. To do otherwise "would be tantamount to holding that skilled concealment is an immovable barrier to proof." Beard v. United States,222 F.3d 84, 89 (4th Cir. 1955), cert. denied 350 U.S. 846 (1955). Furthermore, when the evidence relating to likely sources of income is considered in conjunction with the fact that a large amount of cash was seen in petitioner's safe deposit box in 1973 or 1974 and the number of visits to the box to which petitioner does not specifically attempt to trace expenditures, we are left with the distinct impression that the "amount of cash [in the safe deposit box] was [no] greater at one end of the [taxable period] than the other." Beard,supra at 89. Petitioner cannot complain of our conclusion with respect to the use of accumulated cash, for he has deliberately chosen not to take the witness stand.In fact, respondent requested several times that the trial of this case be continued until the disposition of the criminal case. Singleton v. Commissioner,65 T.C. 1123 (1976). *401 However, petitioner vigorously insisted that it be tried despite respondent's requests to the contrary. Therefore, any disability under which petitioner tried his case and any consequences resulting therefrom are of his own making. Unreported Taxable Income
Petitioner makes numerous objections to the inclusion of various items in the computation of his taxable income under the expenditures method of proof. These objections can generally be divided into the following categories: (1) that respondent failed to affirmatively establish that the expenditures were not made by petitioner from accumulated cash or by means of payments from third persons or entities not constituting taxable income to him, and (2) that certain items should not have been included within the expenditures computation. His basic contention under the first category mentioned above is that respondent's evidence is not sufficient to establish that various expenditures and bank balance increases are properly chargeable to him. For instance, he maintains that there is no evidence to show that the interest credited to the joint savings accounts should be charged to him rather than to his mother. As to numerous expenditures *402 with respect to which respondent seeks to charge him, petitioner maintains that respondent has not established that certain liabilities shown to have been paid were discharged from other than nontaxable sources such as the accumulated cash, his wife, or by means of payments from the corporations which would not constitute taxable income to him. We have previously indicated that petitioner is not entitled to credit for the use of any accumulated cash other than the amount of $600 in 1969 allowed by respondent.This conclusion was based upon the evidence relating to the thorough efforts made by respondent's agents to ascertain the use of beginning resources and nontaxable sources in making the expenditures, the trips to the safe deposit box during the years 1969 through 1972 to which petitioner does not attempt to trace expenditures, the fact that a large amount of cash was seen in petitioner's safe deposit box after the years in question, the total absence of evidence relating to the use of accumulated cash, and the strong evidence relating to likely sources of income. The problem with petitioner's argument relating to the discharge of his personal liabilities by third persons or entities *403 is that these facts are reasonably within his own knowledge and would in most instances, and particularly under the facts of this case, be extremely difficult, if not impossible, for respondent to establish. We believe that once respondent has established that a liability of petitioner has been discharged or that it is reasonable to infer that such a liability has been discharged, he has established primafacie that the payment was made by petitioner. It is then incumbent upon petitioner to come forward with evidence to show that the liability was discharged by means of a payment from another person or an entity not constituting taxable income to him. A similar rule would likewise apply to the increases in the balances of bank accounts maintained by petitioner. The application of such a rule finds support in the following principle enunciated by the Supreme Court in Rossi v. United States,289 U.S. 89, 91-92 (1933): The general principle, * * * is that it is not incumbent on the prosecution to adduce positive evidence to support a negative averment the truth of which is fairly indicated by established circumstances and which, if untrue, could be readily disproved by the production *404 of documents or other evidence probably within the defendant's possession or control. * * * This futile argument by petitioner results simply from his total failure to produce any evidence tending to show that he should not be charged with the expenditures in question. Accordingly, he has been charged with expenditures for his liabilities which were shown to have been discharged. There are certain items of expenditures which we feel warrant separate discussion. First, it was stipulated that quarterly amounts were billed by Hackensack Water Co. to petitioner's residence. There was introduced into evidence only three of petitioner's checks in payment of the quarterly statements. However, we are satisfied after an examination of the stipulated statement and petitioner's checks that the amounts billed were not cumulative and that respondent has established primafacie that the amounts billed in each year were paid by petitioner. Second, petitioner maintains that amounts charged to his accounts with American Express and Master Charge may not be considered an expenditure where there is only evidence of a charge or a credit to the account. For instance, he argues that credits such *405 as those on his American Express statements of September 8, 1969, and November 10, 1969, may have been credits for erroneous charges. Once again, proof of such a mistake is within petitioner's knowledge and his failure to come forward with such evidence has resulted in his being charged with an expenditure for the amount in question. Petitioner concedes in his opening brief that it is fair to assume that the $15 charge in 1971 for annual dues was paid even though there is no evidence of such payment. With respect to the taxable year 1972, it is reasonable to assume that the American Express bill dated May 9, 1972, in the amount of $488, the terms of which are "payable in full upon receipt of statement," was paid prior to the receipt of the next monthly bill received in evidence which was dated October 10, 1972, and reflected a balance of $318.24 which was one month overdue. If such an amount were an erroneous charge, the fact, improbable as it is, is within petitioner's knowledge and it was incumbent upon him to establish this fact; petitioner made no attempt to do so. Similarly, he has been charged with an expenditure for the taxable year 1970 for two credits totaling $391.62 *406 appearing on his Master Charge statements. We have also charged petitioner with an expenditure in the amount of $264.50 for the charge to his Master Charge statement for June 1972, as it appears from an examination of his August statement that his account had been previously credited for such amount.The expenditure reflected in our findings of fact in the amount of $404.03 for payments to Master Charge in 1972 consists of the sum of the above charge and the charges appearing on his August and September statements, the payments for which are evidenced by two of petitioner's personal checks. Third, the payment of $5,200 in cash made by petitioner to Joseph Woods in 1972 was with respect to a written contract between Mr. Woods and 2210 8th Avenue Realty Corp., a corporation wholly owned by petitioner, for the repair of two apartments which were damaged by fire. Without a showing by petitioner that the payment was made by him with funds of the corporation, a fact peculiarly within his knowledge, it is reasonable to infer that the payment constituted a contribution to the capital of the corporation and thus an expenditure by petitioner. Fourth, petitioner contends that he should not *407 be charged with the full amount of the premiums due on the Metropolitan Life Insurance Co. policies which were in force during the taxable years 1969 through 1972, but should be charged only with an amount equal to the gross premiums less dividends paid. Not willing or able to establish the amount of the annual dividends, facts reasonably within his possession or control, he asks the Court to estimate the amount of dividends paid. Petitioner must suffer the consequences of his own silence and has been charged with the full amount of gross premiums due under the policy. Finally, he complains that the estimated amounts of weekly living costs result in a duplication of expenditures. To avoid any duplication, we have eliminated from the computation at page 20 respondent's requested finding with respect to weekly costs of lunches at work due to the likelihood that he ate most of his lunches at the various bars and restaurants. Similarly, we have reduced each of the weekly estimates for (1) reading, recreation, tobacco, etc., and (2) gifts, contributions, and miscellaneous items in the amount of $3 per week. The second category of objections relate to specific items which petitioner *408 maintains cannot be included in an expenditures computation. One of the objections relates to the inclusion of interest credits in the computation, the other to payments in 1971 totaling $13,000 made by three of the corporations to Freedom National Bank in satisfaction of a debt owed to the bank by petitioner. The payments totaling $13,000 were made by means of checks issued by Freddie's 53, Inc., John Wesley, Inc., and J.W.S. Restaurant Corp. in the amounts of $8,000, $3,000 and $2,000, respectively. As a result of petitioner's failure to attempt to establish that the distribution by John Wesley, Inc., was not out of earnings and profits or that the payments constituted loans to him or repayments of loans made by him, facts solely within his knowledge, we have concluded that the entire $13,000 represents taxable income to him. Interstate Circuit v. United States,306 U.S. 208 (1939). Although technically the interest credits and payments by the corporations for the benefit of petitioner do not represent expenditures by him, both must be included in the computation to properly reflect petitioner's taxable income. To eliminate such items from the computation would be to reduce pro *409 tanto petitioner's true taxable income. The effect of including these items of taxable income within the computation achieves the same result as eliminating them from it and then adding them back to the computation totals as specific items of taxable income. Nevertheless, we have adjusted the changes in the balances of the joint savings accounts so as to reflect only that half of the interest attributable to petitioner, thus reducing a portion of the amounts about which he complains. In addition, we have not charged petitioner with interest credits to savings account No. XXX-XX169-7 maintained at the Bank of Orangeburg in St. Matthews, South Carolina, because of our inability to determine the exact amount of interest attributable to each taxable period. We also wish to note the manner in which we computed the amount of nontaxable source funds available to petitioner in 1972 as a result of the sale of his shares in National Investors Corp. Those shares were sold by petitioner on August 18, 1972, for $58,020.21. The total amount realized was deposited in his checking account at the Chemical Bank. In reporting the sale on his Federal income tax return, he used a gross sales price *410 of $56,261.10 and a basis for the shares of $49,281.40. Petitioner's statement of account with National Investors Corp. reflects total "amounts received" by the fund of $40,406.72. Petitioner contends that respondent did not establish that additional amounts were not paid for commissions which would increase his cost basis.However, a careful review of the statement of account reveals that sponsor fees and custodian fees were both deducted from the "amount received" by the fund ($40,406.72) in computing petitioner's net investment. Therefore, we conclude that the "amount received" of $40,406.72 was the proper basis of petitioner's shares in the fund. Moreover, the full amount realized of $58,020.21 should have been used in computing petitioner's gain on the shares. These corrected amounts have been used in determining the amount of nontaxable source funds available to petitioner in 1972. Petitioner contends that he is entitled to several deductions which were not claimed on his tax return filed for the years in question. The burden of proof with respect to each of these items rests upon petitioner. Welch v. Helvering,290 U.S. 111 (1933); The Hicks Co., Inc. v. Commissioner,56 T.C. 982, 1031 (1971); *411 Rule 142(a), Tax Court Rules of Practice and Procedure. See Elwert v. United States,231 F.2d 928 (9th Cir. 1956); United States v. Bender,218 F.2d 869 (7th Cir. 1955). All of those additional deductions relating to interest expense have been conceded by respondent. Respondent has similarly conceded the deductibility of the safe deposit box rentals. The deductibility of the following items not originally claimed by petitioner on his income tax returns filed for the taxable years 1969 through 1972 are in dispute: (1) a casualty loss in the amount of $7,134.60 allegedly sustained in 1969; (2) automobile depreciation; (3) credit card dues; (4) legal fees in the amount of $925; and (5) additional sales tax. The facts relating to the casualty loss are as follows. On October 29, 1968, petitioner sold 374 shares of common stock of Freedom National Bank for $7,234.60. The check issued in payment of the shares was endorsed by petitioner to Ralph Sharpe, a representative of Investors Planning Corp., to be invested in shares of Comstock Fund. Mr. Sharpe never invested the money received from petitioner in those shares. In 1969 petitioner attempted to recover his money by having a letter *412 sent to Investors Planning Corp. In 1970 Gerard Zwirn, petitioner's attorney, was able to obtain $1,000 from Mr. Sharpe in partial payment which he deposited in escrow. Pursuant to an agreement between Mr. Sharpe and Mr. Zwirn, Mr. Sharpe was to pay petitioner $1,000 each month until the full amount was returned.When the second payment was not received, Mr. Zwirn contacted Mr. Sharpe who told him the additional amounts would be sent. However, no additional amounts were ever received. After a period of time, Mr. Sharpe could no longer be contacted. The money placed in escrow was returned to petitioner in 1971 or 1972. On December 10, 1970, Mr. Zwirn instituted a suit against Ralph Sharpe, Investors Planning Corp., and its successor, Equity Funding Corp., to recover petitioner's money. Mr. Sharpe could not be found and was never served. In June 1972, Mr. Zwirn filed a note of issue which is an announcement of readiness for trial. Equity Funding Corp. was declared bankrupt and Mr. Zwirn was enjoined in 1973 from continuing the lawsuit against it. With the exception of the $1,000 obtained from Mr. Sharpe in 1970, no other recovery has been made by petitioner. Petitioner contends *413 that "it would seem" that the loss is deductible in 1969, the year when petitioner discovered the loss, citing only section 165(e). That provision provides as follows: (e) THEFT LOSSES.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. However, section 1.165-1(d)(3), Income Tax Regs., places the following limitation on deductibility of a theft loss: (3) Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss (see sec. 1.165-8, relating to theft losses). However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received. The validity of this provision of the Regulations was upheld in Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975). Thus, we must *414 determine whether there existed a "claim for reimbursement with respect to which there * * * [was] a reasonable prospect of recovery * * *." A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from the third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. Scofield's Estate v. Commissioner,266 F.2d 154 (6th Cir. 1959); Foundation Co. v. Commissioner,14 T.C. 1333 (1950). The determination of whether there existed a reasonable expectation of recovery must be made as of the close of the taxable year for which the deduction is claimed. Parmelee Transportation Co. v. United States,351 F.2d 619, 628 (Ct. Cl. 1965). The situation is not to be viewed through the eyes of the "incorrigible optimist" and, hence, claims for recovery whose potential for success is remote or nebulous will not demand a postponement of the deduction. United States v. White Dental Mfg. Co.,274 U.S. 398 (1927). Whether a reasonable prospect of recovery exists is to be determined only by use of foresight and not by facts whose existence was not reasonably foreseeable as of the close of the taxable year. Ramsay Scarlett & Co. v. Commissioner,supra. *415 Rather than establishing the right to a loss deduction in 1969, the facts tend to establish that a reasonable prospect of recovery existed until 1973. Schacht v. Commissioner,47 T.C. 552, 560 (1967). In any event, we conclude that petitioner has failed to carry his burden of proof that there existed no reasonable prospect of recovery during any of the years in question. Welch v. Helvering,290 U.S. 111 (1933). Petitioner also contends that he is entitled to a depreciation deduction for the use of his automobile in his business. Utilizing a useful life for the car of five years and salvage value of 10 percent, he claims that he is entitled to an annual depreciation deduction of $1,538. The only evidence in the record relating to the extent of his use of the automobile for business purposes is that it was used for driving between the bars and sometimes for going to the market to purchase food. Although petitioner would be entitled to a deduction for depreciation attributable to traveling between two places of business, he is not entitled to a business deduction for depreciation resulting from commuting between his home in Englewood and the areas of the bars. Commissioner v. Flowers,326 U.S. 465 (1946); *416 Heuer v. Commissioner,32 T.C. 947, 953 (1959), affd. per curiam 283 F.2d 865 (5th Cir. 1960). Therefore, petitioner is not entitled to deduct the full amount of the annual depreciation on his car as a business expense. Bearing heavily against petitioner insomuch as the inexactitude of the record is of his own making, we conclude that he is entitled to annual depreciation deductions of $384.50 or 25 percent of $1,538. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Petitioner has offered no evidence in support of the deductibility of his annual dues paid to American Express. Similarly, there is insufficient evidence on which we can ascertain whether the legal fees paid to Gerard Zwirn in 1972 were deductible under section 162 or 212. Accordingly, we conclude that neither of these items is deductible in computing petitioner's taxable income. Welch v. Helvering,supra;Rule 142(a), Tax Court Rules of Practice and Procedure. Based upon the instructions for Schedule A of Form 1040, we have added the sales taxes paid on the purchase of the automobile in 1969 and that included in the payments to Smoak Construction Co. to the amounts computed under the optional sales tax tables. *417 However, the same instructions do not provide for a deduction in addition to that computed under the tables for sales taxes included in the payments to Grubbs Furniture Co. Before leaving the subject of deductions, we wish to point out that petitioner has only been allowed deductions in the computation for state and local income taxes equal to the amounts stipulated, rather than the greater amounts claimed on his tax returns for some years. However, this does not result in depriving him of a benefit for which he is otherwise entitled, for he has only been charged with expenditures for the lesser amounts. As indicated by the foregoing, we have meticulously reviewed the lengthy requested fact findings, objections, arguments and evidence relating to the numerous items reflected in the computation of petitioner's taxable income appearing in our findings of fact. That an item was not specifically discussed herein does not indicate that it was not subject to the same careful consideration. After our thorough review of all the evidence, we are left with the definite and firm conviction that the amounts of unreported income reflected in our findings of fact clearly represent current, *418 taxable income and are not attributable to assets accumulated in prior years. Fairchild v. United States,240 F.2d 944, 947 (5th Cir. 1957). Fraud of Petitioner
The final issue for decision is whether any part of the underpayment of income tax in each year in question was due to fraud on the part of petitioner. "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). The issue of fraud is one of fact to be determined upon a consideration of the entire record. The burden of proving fraud is placed upon respondent by section 7454. Fraud is never presumed. It must be affirmatively established by clear and convincing evidence. Beaver v. Commissioner,55 T.C. 85 (1970); Rule 142, Tax Court Rules of Practice and Procedure. Direct evidence of fraudulent intent is seldom available and whether it exists must be determined from the conduct of the taxpayer and the surrounding circumstances. Fraud must be proved for each year for which respondent seeks to impose the addition to tax for fraud under section 6653(b), [3] for proof of fraud for one year *419 will not sustain respondent's burden of proving fraud in another year. Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958); McLaughlin v. Commissioner,29 B.T.A. 247 (1933). After a careful review of the record, the conclusion is inescapable that respondent has sustained his burden of proving fraud in each year by clear and convincing evidence. The indicia of fraud in the record are unmistakable. We recognize that respondent cannot sustain his burden of proof on the issue of fraud for the taxable years 1970, 1971 and 1972 on the ground that petitioner has failed to carry his burden of proof with respect to the deficiencies in *420 tax in those years. In addition, the mere understatement of taxable income, without more, is not sufficient to support a finding of fraud. Goldberg v. Commissioner,239 F.2d 316, 321 (5th Cir. 1956); Drieborg v. Commissioner,225 F.2d 216 (6th Cir. 1955); Pigman v. Commissioner,31 T.C. 356 (1958). However, "the consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957). Petitioner reported taxable income of $10,393.33, $11,072.71, $12,092.04 and $12,148.14 for the years 1969, 1970, 1971 and 1972, respectively. Our findings of fact reflect unreported taxable income in the amounts of $36,067.05, $18,565.60, $12,798.02 and $49,105.15 in the respective years, thus resulting in a total understatement of taxable income in excess of $116,000 over a four-year period. "Discrepancies of 100 percent or more between real net income and reported income for [four] successive years strongly evidence an intent to defraud the Government." Rogers v. Commissioner,111 F.2d 987, 989 (6th Cir. 1940); Arlette Coat Co. v. Commissioner,14 T.C. 751, 756 (1950). *421 Even had we given petitioner credit for the items allegedly traced to his cash hoard, a clear pattern of understating substantial amounts of taxable income would be present. This would be true regardless of whether we gave him credit in 1972 for approximately $5,500 which represents the difference between the amount of the certificate of deposit acquired on July 10, 1972, and the balance of the savings account closed on that same day, or the inflated $20,000 figure suggested by him. We further find respondent's evidence of "likely" sources of unreported income to be particularly persuasive on the issue of fraud. See United States v. Massei,355 U.S. 595 (1958). Despite petitioner's efforts to distort the testimony of Chester Harris, we find that portion of his testimony relating to the cash transactions between himself and petitioner to be unequivocal. He specifically testified that most of the time he was able to obtain $1,000 in change each week from petitioner to satisfy his change requirements. The coins which Mr. Harris "bought" from petitioner were derived from petitioner's vending machine operation. Although this would indicate that petitioner received gross receipts from *422 that business of approximately $50,000 in at least 1971, he only reported gross receipts of $25,248.10, $26,210.60, $29,233.35 and $20,854.80 in the respective taxable years. Mr. Harris' testimony relating to amounts received from the various bars further convinces us of petitioner's specific intent to evade income taxes during the taxable years 1969 through 1972. Mr. Harris testified that he gave petitioner $500 every week from bar receipts. A portion of the $500 was withdrawn from the receipts of each of the bars that could afford it. Petitioner instructed Mr. Harris as to what portion of the $500 was to be taken from each of the bars. Although cash was withdrawn by petitioner from receipts of each of the bars during at least 1971 and 1972, the only income from the bars reported by petitioner on his Federal income tax returns filed for the years in question was approximately $7,800 per year from John Wesley, Inc. Petitioner contends that "the money received by petitioner was merely an exchange whereby a rotating fund of approximately $500 was maintained to keep some bars from failing and to provide money for expenses and payroll as it was needed." His contention is based on *423 Mr. Harris' testimony that petitioner gave him approximately $500 per week to deposit in the accounts of the bars which were not meeting their expenses. The problem with petitioner's argument is that it ignores the testimony of Mr. Harris that petitioner kept a personal record of the money advanced and withdrew it at a later date when the bars had adequate receipts. The record reveals that petitioner dealt extensively in cash throughout the period in question. Such a course of conduct further supports a finding of fraud. Spies v. United States,317 U.S. 492 (1943); United States v. Schipani,293 F.Supp. 156, 161 (E.D.N.Y. 1968), affd. 414 F.2d 1262 (2d Cir. 1969); Bowlin v. Commissioner,31 T.C. 188, 203 (1958), affd. per curiam 273 F.2d 610 (6th Cir. 1960). Petitioner maintains that a finding of fraud is not justified due to his reliance upon Morris Butcher for tax matters. Although Mr. Butcher performed most accounting and tax-related work for petitioner and the corporations, the record does not support a finding that petitioner relied completely upon him for tax matters. Petitioner's actions during their discussion in 1962 relating to the filing of corporate income tax returns *424 clearly does not indicate a total reliance upon Mr. Butcher. In fact, Mr. Butcher's testimony establishes that he relied upon petitioner for the treatment of certain items appearing in the checkbook of John Wesley, Inc., and for information relating to petitioner's personal vending machine business. Petitioner finally argues that the clear and convincing standard has not been met in light of the unreliability of Special Agent Howard's testimony. However, despite the extensive cross-examination of Special Agent Howard, which consumed over three days of trial time, petitioner is only able to point to eight inconsistencies in his testimony, all of which we consider insignificant. After having observed his demeanor on the witness stand during piercing cross-examination, we accept his testimony as trustworthy. Petitioner relies upon a particular exhibit as "perhaps one of the most revealing documents in evidence which demonstrates the untrustworthiness of Agent Howard's testimony." The particular document consists of the names of various banks, brokerage firms, loan companies and insurance companies to which inquiries regarding petitioner were made. Special Agent Howard had previously *425 testified that, with one exception, no contacts were made with banks or financial institutions prior to the interview of December 11, 1973. The document indicates that the letters were sent in May and June 1973. Upon being questioned about the dates, Special Agent Howard stated that he was absolutely sure that the letters were sent in 1974. In arguing that the year noted on the document was not merely a mistake as indicated by Special Agent Howard, petitioner seems to overlook the fact that the authorization of the investigation from the U.S. Treasury Target Selection Committee had apparently not been received by June 1973. In fact, the team of special agents was not even assigned to the case until September 1973. Both of these facts clearly corroborate the testimony of Special Agent Howard that the letters were sent in 1974 rather than 1973. In addition, the failure to call as a witness Agent Gibbs who prepared the list or one of the representatives of the 31 institutions listed on the document to testify as to this crucial fact gives rise to the inference that such testimony would not have been in petitioner's interest. Interstate Circuit v. United States,306 U.S. 208 (1939); *426 Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We also wish to note that we consider his explanation as to why three other branches of Chemical Bank were contacted to be plausible. Accordingly, we conclude that the evidence is more than adequate to justify the conclusion that respondent has carried his burden of proving that at least a part of the underpayment of income tax in each of the taxable years 1969 through 1972 was due to fraud on the part of petitioner within the meaning of section 6653(b). Requests for Documents
Shortly before the conclusion of the trial of this case, petitioner requested the production of numerous documents contained in respondent's files. Petitioner maintained that these documents were necessary in order for him to further test the credibility of Special Agent Howard. As previously mentioned, we were satisfied with Special Agent Howard's credibility after observing his demeanor throughout three and one-half days of extensive cross-examination, during which we allowed petitioner to obtain many documents from respondent's files for use in his fruitless effort to discredit Agent Howard's *427 testimony.Upon viewing this wholesale request for documents in light of the state of the record, it was apparent to us that the request was merely an attempt to obtain the discovery which petitioner previously withdrew at the calendar call and to gain access to documents otherwise not obtainable under the Federal Rules of Criminal Procedure for use in the pending criminal case.Therefore, exercising our discretion to narrow the range of discovery recognized by the Court in Campbell v. Eastland,307 F.2d 478, 489 (5th Cir. 1962), we denied the numerous requests for documents. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
*. The negative balance of the account as of the end of 1971 was reduced during 1972, thus resulting in a net increase in the account balance for the taxable year. ↩
**. Figures have been adjusted to reflect interest taxable to joint tenant.↩
2. We consider petitioner's argument that he signed the Form 872 extending the statute of limitations for the taxable year 1970 under circumstances constituting duress to be without merit.↩
3. SEC. 6653(b) FRAUD.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩